Next case on this morning's docket is the case of people of the state of Illinois v. Sedgwick v. Sinegal and we have Ms. Joyce Randolph for the appellant and we have Mr. Ting for the athlete. You may proceed. Joyce Randolph May it please the court and counsel, my name is Joyce Randolph and I'm an assistant defender with the Mount Vernon office of the State Appellate Defender and I'm representing Sedgwick Sinegal in this matter. The question in this case is whether the police officer had probable cause to arrest Mr. Sinegal when he did. We have already conceded that the trooper, that the officer, Trooper Goines, had reasonable suspicion to stop the defendant's car. Mr. Sinegal was driving north on Interstate 57 in Union County when Goines observed that the car was going 68 miles an hour, had dark tinted windows and only a back license plate. All three of those were in violation of Illinois law. However, when Goines followed the car to a gas station off Route 146 where the defendant had exited, he found that he never turned on his overhead lights and therefore had not turned on his video camera. Goines didn't discover that until he pulled up behind the defendant's car when the defendant parked at a gas pump there at the Travel Hut convenience store. In any event, Goines discovered that the car was registered and licensed in Louisiana, which permits tinted windows and only requires a back license plate. The defendant indicated that he really, really, really had to use the bathroom and he wanted to go inside to do that and he planned to pump some gas in his car afterward. The officer, Trooper Goines, looked at the defendant's driver's license, which was a Louisiana driver's license, and looked at a passport belonging to the passenger, Lionel Martin. Then he let the defendant go inside the Travel Hut and he said that as the defendant was walking in, he said, do you mind if I check your gas gauge? According to him, the defendant said yes, go ahead. Of course, to do that, the officer had to open up the driver's side door because of the dark tint on the windows. What does he see when he opens the door but a green, I think the record calls it at one point, a green plastic wrapped opaque package, one foot by two feet, a little bit thicker on one end than on the other. I'm getting the impression that it's not just a Ziploc bag, it's like wrapped. Yes. Maybe, what would you call it? Horizontally wrapped. I think they called it shrink-wrapped.  They called it shrink-wrapped. Shrink-wrapped. Okay. And it was a little bit thicker on one end than the other. There's a picture in the record of the package that's laying on a counter at the police station. Now was that, it said it was in the driver's seat, as I read in the brief? Laying against the backrest. Backrest of the driver's seat. Yes. Okay. Okay. Goins, when he looked at the package, he immediately concluded that that package contained drugs, and that was based on prior drug interdictions he'd been involved in up north with the state police in the Joliet District, and he was saying that the packages that he'd seen were similarly wrapped, but they were smaller packages. And Goins, based on that conclusion, arrested the defendant when he came out of the gas station, handcuffed him, and put him in the back of the squad car. And while he was waiting for the defendant to come out, he asked Lionel Martin where they were going. And Martin said he thought they were headed for Indianapolis, but really he was just along for the ride to keep the defendant company. And at that point, Goins radioed in for a backup officer. When that officer arrived, he handcuffed Martin and put him in the back of the second officer's car. And Goins stated in the record that in his mind the defendant was under arrest for possessing controlled substances in that package that he saw in the driver's seat. Now, after everybody was handcuffed and in the back of the squad car, Goins ran the defendant's and Martin's prior criminal histories, found out the defendant had been convicted for some kind of a cocaine offense, and Martin had been arrested for drug offenses in the past. Goins called his sergeant to the scene. Sergeant Kane pierced the package with a pocket knife, and it was later determined that the package contained 24.3 pounds of cannabis. And at the conclusion of the motion to suppress hearing, the court denied the motion to suppress, stating that the defendant's evasive behavior and the appearance of the package gave Goins probable cause to arrest. Now, according to the court, the evasive behavior was that they, right after they passed Goins on the interstate, they immediately took the next exit. They executed sort of a rolling stop at the stop sign at the end of the exit ramp, turned on their turn signal to the left and the right and left again, and finally drove up to the gas pump at the travel lot. All this was going on when Goins did not have the overhead lights activated on his car, and for all anybody knows, nobody had the defendant, neither defendant nor Martin, knew that there was anybody behind them at all. And as a matter of fact, when they pulled up to the travel hut, they immediately got out of the car. And the officer pulled up right behind them and said, get back in the car. Now, was this right up next to the gas pumps? Yes. The defendant was parked at the gas pump. And Goins said, get back in the car, and he asked for their ID and checked out the license plate situation and all that sort of thing. And the defendant said, you know, I really, really, really have to go to the bathroom. Can I go? And the officer apparently believed it because he did let him go after he thrusted. And it just seems, it does not appear that such would be basic behavior, especially when you're considering that you've got people in the car that really have to go to the bathroom and they really want to go inside and, okay, maybe he did, was a little confused with the turn signals, was looking to see if there's another place to stop, whatever, I don't know. So would it be considered a basic behavior when the passenger had no idea where they were going? Well, my reflection for the record is that the passenger said, I think we're going to Indianapolis, but I'm just along for the ride. And the defendant later on confirmed that, yes, we are going to Indianapolis. Now, if the passenger said we're going to Chicago and somebody else said no, we're going to Louisville, Kentucky, that would have been something different. But they both essentially said, yes, we're going to Indianapolis. So what's inconsistent about that and what's evasive about that? And the defendant's intention was that he did not give him permission to look at the gas gauge? It's not exactly clear in the record, but it seems to me that the defendant was, well, the defendant was suspicious of why the officer was even talking to him at all. And he made some statement to the effect that, are you profiling me? And the officer said, yeah, I'm profiling you. Now, whether that was just a smart remark by the officer to the question or whether that really happened, the trial court didn't believe that it happened. Did he give him permission to look at the gas gauge? It's not clear in the record that he said, no, you can't go into the car. Because, you know, I think every car that I've ever had familiarity with, you have to turn on the key. The ignition key has to be on an on position or partly on in order for the gas gauge to be engaged. Yes. So he would have had to reach in, either reach in or get seated in order to see what the gas gauge was reading, correct? The defendant did not come back to the car after the officer told him he could go inside and use the restroom. He did not come back to the car to turn on the key or anything like that, no. No, but the point is that I'm wanting to know whether or not he did give him permission, and you're saying it's unclear, to actually look at the gas gauge. Well, according to the officer, he said, yes, you can look at it. For what reason, I have no idea, because like you said. But if he does look at it, he's going to see this object in the driver's seat. There's no question about that. Yes. And it's your contention that there's nothing at all suspicious about that object? Well, Your Honor, it really kind of looks like it could have been a lumbar support for the driver's side. Or, I don't know, I suppose it could have been a JCPenney catalog package or any other kind of something that comes in the mail. I don't know. Was this wrapped with silver tape? I saw a bunch of talk about silver tape. Was it wrapped in duct tape also? No. Okay. It was not wrapped in any duct tape. But you do, you know, the Jones case, I believe, was my case. Carlos Jones, the one-hitter box? Yeah. Yes. And the Supreme Court did clarify and make me aware that police officers do have the right to use their training and experience in determining suspicious containers of narcotics. Correct? Isn't that what you gathered from the Jones case? Well, I don't think it's really as broad as perhaps you think it is. There's a big difference between a bindle and a knotted-off balloon and a one-hitter box and a tinfoil packet. And this package that weighed 24 pounds. And the officers kept saying, it's identical to all these packages I've seen in all these drug interdictions. But it's clear that it wasn't because he says, yeah, but it's quite a bit bigger than those packages I've seen. I think he was talking about it was wrapped the same way? Yes, is what he was talking about, was that it was tightly wrapped. It was opaque and it was tightly wrapped. And that was the only similarity there. I mean, we don't know anything about the facts of those prior cases, whether those things that he saw were hidden within a vehicle in some sort of a secret compartment or if they'd been thrown out of a vehicle or found in a semi-full of mattresses or what the story was. But in any event, this package was not absolutely identical to those packages that he'd seen before. And of course, we don't know what circumstances were of all those cases either. Are there any questions? I'm going to say you also have the opportunity to address Mr. Ting. Thank you, Justice Shetland. Your Honor, I'm going to report. Counsel, my name is Timothy James Ting, and I do represent the people of the state of Illinois. Your Honor's experience is a basis of humanity that induces inferences about certain opaque containers. Even a layperson can say a refrigerator probably contains food, a washing machine probably contains clothes. And on April 16, 2009, when Trooper Goines and Sergeant Lawrence encountered an opaque, shrink-wrapped, cellophane, 12-inch by 24-inch bundle-style package, one thing came to their mind, narcotics. The defendant had this court believe that it could contain limitless possibilities, foregoes the very training and experience that these officers had to detect the exact type of package like they had in this case. Now, Your Honor, the defendant contests both the factual findings of the trial court and the legal conclusions. So I'll begin with the factual findings. The factual findings are under a manifest way of evidence standard of review. Here, factual findings, as the defendant stated, there was a basic driving, which you can see on 18, 19, 23, 32, 33, 104, 32, 132, and 164 of the record. The defendant had tinted windows, he had a license plate that was not on the front, and he committed a rolling stop, all things which the officer had reasonable suspicion to stop his vehicle. But he determines that that's not a violation prior to looking into the car, I believe, correct? The license plates and the tinted windows? Absolutely, but it was enough to follow the vehicle and make the stop. Now, once he stopped the vehicle, that's when the other factors came about. The defendant and his co-defendant were both acting nervous, as you can see on the record on page 111, 112, and 137. And the statements by the defendant, Justice Chapman, you specifically asked, wasn't it evasive, their responses as far as their destination? Well, particularly the record shows that this is what happened. The defendant stated they were going to Indianapolis, and I quote. He was just along for the ride and, I quote again, didn't know quite where they were going. Moreover, and that's on page 103 of the record, moreover, there's more evidence of evasiveness because the defendant's passenger, Lionel Martin, said he didn't know what the package was or how it got there. So all of these indications lead up to that evasiveness that we're talking about here. The defendant was able to go to the bathroom, came back to the car, and it is undisputed the defendant actually testified during his motion to suppress hearing, and he never said that he did not give the officer the opportunity to look at his gas gauge. The officer's testimony then, therefore, is undisputed where he says the trooper was allowed to use the restroom, allowed the defendant and his passenger to use the restroom, then come back and ask to see the gas gauge, which the defendant consented to on page 25, 99, 100, and 134 of the record. Therefore, to get to the package is undisputed. And once we see the package, then the question becomes whether it was immediately apparent under the plain view doctrine. Again, under the manifest weight of the evidence, Trooper Boyne specifically testified that he had seen virtually similar packages five previous times, 106, 126, and 142 of the record. Sergeant Lawrence said that he had seen approximately, and I quote, eight to ten packages that, and I quote again, were virtually identical with a tightly wrapped, sealed plastic, consistent with everything that I've ever seen regarding narcotics, consistent with every picture I've ever seen, everything I've put my hands on, every area package I have assisted on, page 173 of the record. Surely, when Trooper Boyne has seen a package virtually identical five times and Sergeant Lawrence has seen a package eight to ten times, this is the type of case where the manifest weight of the evidence certainly supports the trial court's decision. So therefore, it comes to the legal conclusions of the trial court. Now, this is under the no standard of review, and this is really where the battleground is. The particular aspect of the plain view doctrine that is in dispute is whether that package was immediately apparent for the officer to suspect that it was a narcotics package. Now, the defendant spent some time on People v. Penny in her brief, which is an Illinois case which states that a driver who had an expired license plate was pulled over, and a seven-inch by four-inch plastic wrap container was discovered by the officer. And the court said – the Penny court said that was not enough probable cause to take that package and believe that it was something that contained narcotics. Penny's decision, and frankly, is wrong. But moreover, the facts of Penny are distinguishable from this case. Not only was the Penny – the Penny defendant was nervous as well, but here not only was the defendant and his passenger nervous, as you can see in 111, 112, and 137 of the record, but they also gave differing responses as to where they were going. They also gave differing responses as to – well, there's only one instance in the record, but apparently Lionel Martin had stated he didn't know what the package was. He didn't know how it got there. As far as what the defendant stated, it's not in the record. But we have Lionel Martin who sees a package, 24-inch, in the driver's seat and says he doesn't know how it got there and what it was. Surely, that in and of itself is suspicious probable cause. Now, I point this court directly to the precedent established in the United States Supreme Court with the first real plain view doctrine for narcotics cases in Texas – USP, Texas – or USL – Texas people, right? And in that case, there was a tied-off balloon. Now that the officer saw it, based on his training and experience, he grabbed the tied-off balloon and it contained narcotics. The landmark decision here for Illinois, the most precedential decision we have, is People v. Jones, which Justice Chester I think you had alluded to, and that was a one-hitter box. In both of those cases, they said that there was probable cause, and the experience of the officers showed that it was immediately apparent to the officers based on their training and experience to discover that that was narcotics and seize the case. Now, in both of those cases, they're certainly not the package we have here. The one-hitter box is smaller, as is the balloon. But the difference between a tied-off balloon and a 12-inch by 24-inch shrink-wrapped cellophane opaque package really is no difference at all if you're a trained officer. Certainly, if this package had been a Christmas present, a Christmas present wrapping, or if it was a briefcase, certainly the limitless possibilities argument, which the defendant makes, would make some more sense. It would have merit. But in this case particularly, we have an unnatural setting of a package that's shrink-wrapped and cellophane and opaque. Officer Goins and Sergeant Lawrence both testified that the reason that they're opaque is so that you can't see the narcotics. The reason that they're cellophane and shrink-wrapped is so that you can't smell the narcotics, and you can find this on the record sites within the brief, the brief that I cited in this report. As you can tell, Your Honors, this is not a case where Officer Goins simply happened upon a package and unjustly took it. Now, based on his experience and expertise, he saw the package and discovered, given the defendant's criminal history, the defendant's co-defendant's criminal history, as well as their nervousness and basic driving and basic responses, that this package indeed contained narcotics. Now, admittedly, we don't have an Illinois court decision that specifically states to this particular type of package, and that's all the more reason why this is a publishable decision. It needs to be a clear, bright-line test. What we do have is precedent from other jurisdictions that give us some understanding as to the evolving standards of the quantum of evidence necessary for probable cause searches. I point this court to several cases. U.S. v. Medina, it's a federal court on the Fifth Circuit where they found brown cellophane-wrapped bundles in the back cab. That was under the Plain View Doctrine. U.S. v. Williams, another federal court case in the Fourth Circuit where there were five packages wrapped heavily in cellophane and a layer of brown material. I point to U.S. v. Praney, another federal court decision in the District of Columbia which stated specifically a kilo-sized rectangular package wrapped in silver duct tape sticking out of a perfume bag was under probable cause, and that may have been what you were alluding to, Justice Welch. Again, People v. Germany is a New York case in which three very tight square-shaped bundles of newspapers were found to be under the purview of Plain View Doctrine. Specifically, the federal cases when we have plastic containers in cellophane, which is akin to all of those. In this case, the probable cause analyses under the purview of the Plain View Doctrine is something that should be analogously applied to this case. And admit, the People v. Penny's decision may seem superficially to be the most analogous case, and that's an Illinois case, and that is for the defendant. Again, I would point this court to, one, the evolving standards, and two, the fact that People v. Penny is distinguishable on its facts. As the People v. Germany court in the New York Superior Court stated, and I quote, the decisions of the courts continue to evolve fluidly in their findings of evidence required to find probable cause. And it goes through a lengthy analysis of the differing techniques and training and experience that our narcotics officers who are trained in these areas look to find. As a last note, I would urge this court to publish this decision because of its effect and nature. This is a case that is in line with Jones, where the Illinois Supreme Court has given a directive, and this is a case where we can either take that Illinois Supreme Court case and really apply it to another specific circumstance. Because it's not a one-hitter box. It's a different type of package. But the same analyses in Jones apply here. It's a training experience of the officers, and an officer has seen virtually identical packages five times with Trooper Goines and eight to ten times with Sergeant Lawrence. This is exactly the type of case in which the Jones analysis should be applied to further clarify what the law is. Thank you, Your Honor. Should we publish it if you lose? I'm sorry, Your Honor? Should we publish it if you lose? Absolutely. Absolutely, Your Honor. In all justice, I absolutely agree. Thank you. That was teasing. Thank you, Mr. Ting. Ms. Randolph, do you want to publish this as well? I'll read it if I lose. Fair. Fair response. Okay. If my recollection is correct, a kilo is 2.2 pounds, and this package we're talking about is over 24 pounds. There's a difference between RAP package's kilo size of cocaine and this 24-pound package. That also makes a pretty big lumbar support pillow, doesn't it? I don't know. I don't have any experience with lumbar support pillows except for the ones on my office chair, and frankly, that was too big to suit me. Was it very heavy? Was that a very heavy package, your office chair? I don't know. I don't remember. But in any event, what Mr. Ting seems to be suggesting is that we should absolutely defer to the training that these police officers have, and I don't think any court should find that that is the case. There are all sorts of things that could be packaged in an opaque shrink-wrapped package. I've gotten books from Amazon.com that were like that. It may look like a kilo. I don't know. But that's not what it was. The purpose of wrapping something in opaque wrapping and shrink-wrapping it is to attend to the privacy of the person who's getting it and to make sure that it doesn't come open during transit. That's all that that means. So as we stated in our brief, there's a difference between one heater box and a bundle and a knot of that balloon. And Mr. Ting also makes it sound like the defendant was arrested after all this stuff happened during the traffic stop. Mr. Sinegal was handcuffed and arrested when he came back from the bathroom. All the officers saw was that package there, and bingo, it's illegal drugs, and I've got grounds to arrest this man. He didn't wait until after he got the defendant's criminal history. He didn't wait until they finished searching the car. He didn't wait until they punched the package, nothing. They arrested him when he came back to the car after the officers saw that package in the driver's seat. And as Mr. Ting pointed out, your honors have a de novo review in this case, and we asked the court to find that the defendant's behavior was not evasive. Perhaps nervous as anybody arrested on an interstate highway far from home would be, but certainly not amounting to evasive behavior that would support the immediate inference that this package contains illegal drugs. And we ask that your honors reverse the order denying the motion to suppress. Are there any questions? Thank you, Ms. Randolph, and thank you, Mr. Ting, for your briefs and your arguments, and we'll take the matter under advisement. At this time, we stand on recess until 1 p.m.